07-2365-cr
USA v. Kaiser

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

Argued: July 6, 2009                      Decided: July 1, 2010

_____

Docket No. 07-2365-cr

_____

UNITED STATES,

Appellee,

-v-

MARK P. KAISER,

Defendant-Appellant.

_____

Before JACOBS, Chief Judge, CALABRESI, and POOLER, Circuit Judges.

_____

Mark P. Kaiser appeals from a judgment of conviction and sentence entered on May 18, 2007, following a jury trial in the United States District Court for the Southern District of New York (Griesa, J.). Kaiser argues that there were two errors in the district court's jury instructions, three erroneous evidentiary rulings, and two errors in sentencing. We conclude that the district

court erred in its instruction with respect to the conscious avoidance theory and in admitting the statement of U.S. Food Service's General Counsel, but we reject Kaiser's other claims on appeal. We do not reach Kaiser's sentencing claims. Accordingly, the judgment of the district court is **VACATED** and the matter is **REMANDED** to the district court for a new trial.

_____

RICHARD J. MORVILLO (Andrew L. Frey, Peter H. White, Charles Rothfeld, Daniel T. Brown, Michael S. Passaportis, on the brief), Mayer Brown LLP, Washington, DC, for Defendant-Appellant.

DANIEL P. CHUNG, Assistant United States Attorney, of counsel to Preet Bharara (Daniel A. Braun, on the brief), United States Attorney for the Southern District of New York, New York, NY, for Appellee.

_____

POOLER, Circuit Judge:

Mark P. Kaiser ("Kaiser") appeals from a judgment of conviction and sentence entered on May 18, 2007, following a jury trial in the United States District Court for the Southern District of New York (Griesa, J.). The government alleged at trial that Kaiser, a high-level executive at U.S. Food Services ("USF"), made fraudulent misrepresentations regarding the financial condition of USF, and ultimately, the financial condition of Royal Ahold N.V. ("Ahold"), which acquired USF in April 2000.

Count One of the indictment alleged that from April 2000 to February 2003, Kaiser participated in a conspiracy to commit securities fraud, to make false filings with the Securities and Exchange Commission ("SEC"), and to falsify books and records, in violation of 18 U.S.C. § 371. Count Two charged that Kaiser committed securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. Counts Three, Four, Five, and Six

2

charged that Kaiser made or caused to be made a false filing to the SEC on behalf of Ahold, in violation of 15 U.S.C. §§ 78 m(a) & 78ff, 17 C.F.R. § 240.13a-1, and 18 U.S.C. § 2.

The jury returned a verdict convicting Kaiser on all five counts of the indictment. With respect to Count One, the conspiracy count, the jury found that the objectives of the conspiracy included making false filings and falsifying books and records, but not committing securities fraud. Judge Griesa sentenced Kaiser principally to a term of 84 months' imprisonment and imposed a $50,000 fine. Kaiser has been released on bail pending resolution of this appeal.

Kaiser argues that there were two errors in the district court's jury instructions, three erroneous evidentiary rulings, and two errors in sentencing. With regard to the jury instructions, Kaiser contends that the district court made errors on the conscious avoidance theory and the "willfulness" element of securities fraud. Kaiser argues that the district court also erred in admitting 1) evidence of his fraudulent dealings before the charged securities fraud began in April 2000, 2) certain business planners under the business records exception to the hearsay rule, and 3) a hearsay statement that USF's General Counsel wanted to report Kaiser to the SEC. Finally, Kaiser argues that the district court improperly calculated his sentence.

We conclude that the district court erred in its instructions with respect to the conscious avoidance theory and in admitting the statement of USF's General Counsel, but reject Kaiser's other claims on appeal. Because we vacate and remand the matter to the district court for a new trial, we do not reach Kaiser's claims that the district court's sentencing determination was in error.

## I. BACKGROUND

USF is one of the largest distributors of food and related products in the United States.

3

Its primary business is to serve as a middleman by purchasing various food products from manufacturers and selling them to restaurants. Between 1994 and 2001, Kaiser supervised employees in USF's Purchasing Department, which managed the company's dealings with its food vendors. In the Purchasing Department, Kaiser negotiated payments from vendors known as "promotional allowances," or "PAs," a type of rebate paid to USF upon satisfaction of certain purchasing targets. These PA payments are an important source of revenue for USF and a profitable aspect of its business.

The indictment issued against Kaiser charged that he devised a scheme to fraudulently inflate USF's PA income for the years 2001 and 2002, that he engaged in further fraudulent acts to hide the inflated numbers from outside auditors, and that he made various misrepresentations to the auditors concerning the PA agreements with vendors. The government's case against Kaiser was primarily built around the testimony of three cooperators, all of whom testified pursuant to plea agreements with the government: 1) Tim Lee, a USF employee in the Purchasing Department, 2) Bill Carter, who worked for Lee at USF, and 3) Gordon Redgate, who owned two corporations that provided services to USF related to the scheme. Lee and Redgate testified that Kaiser engineered the scheme and knew it was illegal. Kaiser, on the other hand, argued that he had been set up by Lee and Redgate as a scapegoat and that he had been unaware of the fraud.

A.      **Promotional Allowance ("PA") Income Scheme**

Lee testified that, beginning in the 1990s, Kaiser negotiated PA contracts that required vendors to prepay PAs, subject to the condition that USF would repay the amount if it did not meet its targets. Although the PA payments were not actually earned until USF met the conditions in the contract, Kaiser immediately recorded the prepayments as income in USF's

4

books and records, thereby artificially inflating the amount of revenue USF had earned from PA payments to ensure that USF met its earnings and other budgetary targets. USF executives, including Kaiser, only received bonuses when USF met these targets, providing a powerful motive for Kaiser to inflate USF's PA income.

As an example, Lee testified about Kaiser's involvement with vendor Puritan Chemical. According to Lee, Kaiser negotiated a $26.5 million PA from Puritan Chemical in 1999 to be earned over a term of ten years. The agreement provided for an $18 million prepayment to USF, despite the fact that none of the conditions of the PA had been met. To disguise the payment, Kaiser sent Puritan Chemical's check to a third-party intermediary company owned by Redgate, which broke up the payment into six smaller checks and sent them to USF. Kaiser argued that it was Lee who was responsible for most of the vendor contracts containing prepayments, pointing out that "[o]f the 80 contracts in the record from 2000 and before, Kaiser signed 9 and Lee signed 45."

Lee also testified that Kaiser developed a scheme in the 1990s whereby Kaiser would take "PA deductions" out of amounts that USF owed to vendors for goods, thereby increasing the amount of PA income on the books. Many of these deductions were inaccurate and not authorized by the vendors. If a vendor complained, Kaiser would either negotiate with the vendor to pay back the deductions the following year, thereby allowing USF to meet current-year budget targets, or he would stall until the year-end audits had been completed. Both the PA prepayment scheme and the PA deduction scheme resulted in inflated PA income on USF's books.

5

**B.       Scheme After Ahold's Acquisition of USF**

In April 2000, Ahold acquired USF.  In early 2001, Kaiser was named the Chief

Marketing Officer of USF, and his focus shifted away from purchasing to the retail side of the

business.  According to Lee, however, Kaiser continued to be involved in a constellation of PA-

related schemes to boost USF's revenue.  For instance, Lee testified that Kaiser coordinated

approximately $100 million in fraudulent PA deductions in 2001.   Kaiser, however, alleged that

it was Lee who executed the deductions and that Kaiser believed them to be valid.  Kaiser also

pointed out that his departure from the Purchasing Department coincided with a dramatic

increase in the number of vendor contracts, many of which had prepayment terms, and that it was

Lee and Carter who were responsible for them.  Kaiser signed only one contract after 1999, and

that contract had no prepayment term.

Lee also testified concerning Kaiser's role in setting the "PA rate," or the amount of PA

income USF expected to receive in a given fiscal year.[1]  The rate was calculated based on PA

income received in previous fiscal years and then adjusted for increases or decreases in sales and

projected sales.  However, because USF's PA income had been inflated in previous years, the PA

rate for fiscal year 2001 was also inflated.  In order to compensate for this shortfall, the

government argued that Kaiser recorded and caused others to record non-existent PAs in

"top-side journal entries" on the company books.  This resulted in phantom accounts receivable

for PA payments that USF was not, in fact, owed.  By January 2002, the accounts receivable

---

[1]   Kaiser denies being responsible for setting the PA rate.  Lee testified that he was not certain who set the rate, but that Kaiser was involved in certain conversations about it.  However, the government introduced a July 11, 2001 email document in which Kaiser informed other USF employees of the "rate that you should be accruing" based on Kaiser's assessment of the accounting.

balance for PA payments had grown to $300 million. By the end of 2002, the balance had ballooned to more than $700 million.

## C. Deloitte's Audit of USF

After Ahold acquired USF, the accounting firm Deloitte & Touche ("Deloitte") was hired to audit USF's year-end financial statements. Although Kaiser was no longer the head of the Purchasing Department, he was still responsible for helping Deloitte conduct its audit of USF's PA income. Most of the acts charged in the indictment concern Kaiser's involvement with the Deloitte audit.

### 1. Fraudulent Accounting Practices

According to the government, because Kaiser knew that a high PA accounts receivable balance would raise the suspicion of Deloitte auditors, he began manipulating ordinary, non-PA payments to make them appear to auditors as if vendors were paying down their PA balance. For example, in the 2001 audit, there was a $10.6 million payment from Redgate's company that was treated as a PA even though it was not related to any PA transaction. Kaiser sent Redgate a backdated letter requesting that the payment be treated as a PA and asked Redgate to send auditors only the top part of the check so that they would not know the purpose of the payment. Redgate wrote in his planner on February 5, 2002, that Kaiser had called to say he "needs top copy of check dated 4/11/02 for 10 million. <u>Top portion only</u>!"

The government also cited a $1.6 million payment received from the vendor Frozen Farms, which was recorded as a PA payment from another vendor, Koch Poultry Farms. Later, Kaiser signed and sent Koch Poultry Farms a confirmation letter stating that it owed USF $3.18 million. By reallocating the $1.6 million that had been received from Frozen Farms to the

PA-related account receivable for Koch Poultry, the government argues that Kaiser endeavored to mislead Deloitte auditors by creating the false impression that the approximately $3.18 million PA figure was legitimate and that it was being paid down by Koch Poultry. Kaiser responded to these allegations at trial by emphasizing that the allocation of PAs among vendors had innocuous explanations, including that the reallocation of funds was necessary to account for changes in USF's business.

## 2. Fraudulent Misrepresentations

In addition to attempting to hide the inflated PA income, Kaiser allegedly lied to Deloitte auditors about two facts related to the PA agreements. First, the government alleged that in order to hide the existence of PA prepayments, Kaiser told the auditors that USF did not receive prepayments. In a document that appears to have been prepared for a November 29, 2000 Audit Committee Meeting, with "Mark Kaiser," typed on the front cover, there is a statement that appears to have been drafted by USF management to Deloitte. The statement provides that USF did not "regularly negotiate 'up-front' payments from vendors for its [PA] programs." This turned out to be false. Kaiser argued that the misrepresentation could not be directly attributed to him, and that, in any event, he was never made aware of the number of PA agreements with prepayment terms.

Second, the government alleged that in order to hide the prepayments from the auditors, Kaiser told them that USF did not have written PA agreements with the vendors. In a letter providing recommendations to USF management for the year ending December 29, 2001, Deloitte included an "[o]bservation" related to USF's "promotional allowances with vendors" that "no formal written agreement's [sic] are signed." An auditor testified that the document was

8

discussed at a meeting attended by Kaiser. Kaiser argued that this statement was not specifically attributed to him, and pointed to testimony from auditors at trial that indicated their understanding that there were some written agreements in place.

### 3. Fraudulent Confirmation Letters

Finally, the government alleged that Kaiser attempted to hide the inflated PA income from Deloitte auditors by drafting and sending confirmation letters to certain selected vendors requesting confirmation that USF had earned and was owed the PA amounts reflected on its books. Lee testified that one vendor, Pactiv, was shocked by a letter asking it to confirm that it owed $5.6 million in promotional allowances for 2001. Another vendor, Ken's Foods, refused to sign a letter unless Lee signed off on an additional letter stating that the amount in the confirmation was not actually owed.

Redgate testified that his company had signed confirmation letters after receiving assurances from Kaiser that it would not have to pay the amounts set forth in the letters. The government introduced evidence at trial, the admissibility of which is now at issue on this appeal, that Redgate contemporaneously recorded these conversations in business planners. Kaiser argued that the government relied almost exclusively on these planner entries to show that the confirmation letters signed by Kaiser were not good faith estimates of the vendors' PA obligations. The trial court admitted the planners over Kaiser's objection under the business records exception to the hearsay rule. Fed. R. Evid. 803(6).

### D. The Scheme Unravels

The final straw was a letter signed by Kaiser and sent to the vendor Heritage Bags stating that Heritage owed a PA balance of over $12 million. The CFO of that company was a former

Deloitte auditor, who became concerned and sent a separate letter to Deloitte setting forth the accurate balance, $2.5 million, and also disclosing that there was a prepayment and a written agreement. On February 11, 2003, after receiving this letter and other evidence that USF had agreements with vendors that provided PA agreements, Deloitte suspended work on its 2002 year-end audit.

An investigation ensued, resulting in an indictment against Kaiser charging him with conspiracy to commit securities fraud, make false filings with the SEC, and falsify books and records; securities fraud; and making false filing with the SEC. Trial commenced on October 12, 2006 and on November 8, 2008, the jury returned a verdict of guilty on all counts. Specifically, the jury found the that objectives of the conspiracy included making false filings and falsifying books and records, but not committing securities fraud. On May 17, 2007, Judge Griesa sentenced Kaiser to 84 months' imprisonment, two years' supervised release, a $50,000 fine, and a $600 special assessment. This appeal followed.

## II. DISCUSSION

Kaiser raises many different challenges to the trial below. We first consider Kaiser's claims with respect to the conscious avoidance and willfulness jury instructions. We then turn to Kaiser's argument that he had insufficient notice of evidence the government introduced relating to his activities before 2000. Finally, we consider Kaiser's claims with respect to the testimony of USF's general counsel and the district court's admission of Redgate's business planners.

A.    **Jury Instructions**

Kaiser argues that the district court erred in instructing the jury with respect to the wilfulness requirement and the knowledge requirement of securities fraud. We affirm the district

10

court's instructions on willfulness, but agree that the district court erred in instructing the jury on the issue of conscious avoidance.

**1.      Conscious Avoidance**

Judge Griesa instructed the jury with respect to the knowledge requirement as follows:

> In determining whether the defendant acted knowingly, you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious.  To put it in very concise terms, there are times that a person can consciously avoid looking at facts that are available and that, in the law, is the equivalent of knowledge; in other words, you can't just hide yourself from knowing something, deliberately hide and then escape responsibility for that.  And so we have the concept in the law of conscious avoidance.

> And if there was conscious avoidance, that is deliberate failure to learn information, then that is the equivalent of actual knowledge, because somebody can't escape criminal responsibility by deliberately shutting his eyes to something which would have told him the facts.

On appeal, Kaiser argues that the jury instruction did not contain two elements necessary for a conscious avoidance charge: "that knowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist."  United States v. Schultz, 333 F.3d 393, 413 (2d Cir. 2003) (internal quotation marks omitted).

**a.      Standard of Review**

Kaiser's claim with regard to conscious avoidance is subject to review for plain error because he failed to raise an objection to the charge.  Fed. R. Crim. P. 30(d).  Judge Griesa first proposed the idea of a conscious avoidance charge sua sponte during a conference on November 3, 2006.  The government stated that it was in favor of the charge and defense counsel that it was opposed.  Judge Griesa indicated that he would give the charge, although he did not inform

11

counsel of the precise language he would use. Later that day, the government submitted a proposed charge containing the "high probability" and "actually believed" language. Four days later, on November 7, Judge Griesa gave an abbreviated version of the government's charge, without the language. Although defense counsel could not have been expected to have reviewed the law on conscious avoidance when the issue was sprung on them on November 3, by November 7, the defense team had more than enough time to review the relevant cases. The defense objected to the charge as given, and the following discussion occurred:

> MR. WHITE: The conscious avoidance instruction . . . has to make clear that . . . if the defendant actually believed that the scheme or its goals did not exist, a finding of conscious avoidance is improper; in other words, it doesn't deal with . . . participation of the conspiracy.

> THE COURT: Look, I'll give the mere presence, I'll do it.

> MR. WHITE: Okay. . . . It was a specific point as to conscious avoidance because it's improper for them to find he participated in the conspiracy through conscious avoidance, only – the only aspect of the conspiracy charge or scheme charged that's proper for them to consider conscious avoidance is in knowledge of the object, and there's requirement of knowing membership as the Court instructed and requirement of knowledge.

> THE COURT: I don't understand what you're getting at. . . . .

> THE COURT: The conscious avoidance is a – it's another way for them to find knowledge, that's what I specifically said, and knowledge and intent is an element of each of . . . the crimes charged here.

> MR. WHITE: I only mention this – the Second Circuit has held that it's improper for a jury to conclude that conscious avoidance was a way for someone to have knowledge of a conspiracy itself. Conscious avoidance is appropriate only for the – not for the membership in the conspiracy, but for the knowledge of its objects. That's the distinction the Second Circuit has drawn in terms of conscious avoidance. . . .

> THE COURT: That's probably a good point, okay.

12

Judge Griesa subsequently issued a clarifying instruction to the jury that "mere presence or mere acquaintance with conspirators" was insufficient, and that conscious avoidance pertained only to "the objects of the conspiracy or the substantive crime." Defense counsel had no objection.

Although the words "actually believed" were used at one point by defense counsel, review of the entire colloquy supports the government's position that the defense failed to raise the issue it now raises on appeal – that Judge Griesa's charge did not contain the "high probability" or "actually believed" language required under Schultz and many other cases discussed below, none of which was cited to the district court. 333 F.3d at 413.

Accordingly, under the plain error standard, Kaiser must demonstrate that any error (1) is "clear or obvious, rather than subject to reasonable dispute"; (2) "affected [his] substantial rights" – i.e., "that there is a reasonable probability that the error affected the outcome of the trial"; and (3) "seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Marcus, No. 08-1341, 2010 WL 2025203, at *3 (May 14, 2010) (internal quotation marks and alterations omitted).

**b. Error**

The government concedes that "[t]his Court has held that a conscious avoidance charge must communicate two points: (1) that a jury may infer knowledge of the existence of a particular fact if the defendant is aware of a high probability of its existence, (2) unless the defendant actually believes that it does not exist." See, e.g., Schultz, 333 F.3d at 413; United States v. Sicignano, 78 F.3d 69, 71-72 (2d Cir. 1996) (per curiam); United States v. Feroz, 848 F.2d 359, 360-61 (2d Cir. 1988) (per curiam); United States v. Shareef, 714 F.2d 232, 233-34 (2d Cir. 1983); United States v. Cano, 702 F.2d 370, 371 (2d Cir. 1983) (per curiam).

13

Indeed, we have repeatedly emphasized these two elements, stating in Feroz that "the prosecutor should request that the 'high probability' and 'actual belief' language be incorporated into every conscious avoidance charge." 848 F.2d at 361. We ordered that the opinion be circulated to all Assistant United States Attorneys engaged in criminal prosecutions in the Circuit. Id. In Schultz, we clarified that the language of our prior decisions did not have "talismanic weight," and approved a charge that "could 'have been more precise.'" But that charge included both the phrases "high probability" and "actually believed," leaving no question as to whether those ideas were conveyed. 333 F.3d at 414. In Sicignano, we clarified that "[a]n instruction that the jury cannot find knowledge on the basis of mistake or accident is not an acceptable substitute for the balancing charge which incorporates the concept of actual belief." Sicignano, 78 F.3d at 72.

Judge Griesa's jury instruction on conscious avoidance did not contain either the "high probability" or the "actual belief" language that we have long held is essential for an accurate conscious avoidance instruction. Moreover, we agree with Kaiser that the jury instruction on this point might well have confused the jury. Instead of using the "high probability" language, the district court instructed that "there are times that a person can consciously avoid looking at facts that are available and that, in the law, is the equivalent of knowledge . . . ." There is some risk that the jury could have convicted if it concluded that Kaiser was merely negligent.

Similarly, the "conscious avoidance" charge contained nothing to suggest that actual belief would absolve Kaiser of culpability. Although the jury was told in a separate instruction on "knowledge" that Kaiser "cannot be convicted of mistake, he cannot be convicted if he in good faith thought that these results were correct," the "conscious avoidance" charge was

14

presented as an alternative basis on which the jury could find knowledge. Thus, it is possible that the jury could have convicted Kaiser even if it concluded he had an actual belief that the PA numbers were correct.

We conclude, therefore, that the jury instruction was in error. In light of Feroz and Schultz, that error was clear.

c.     **Substantial Rights**

The government argues that there can be no prejudice from the conscious avoidance instruction because it relied "principally on the overwhelming evidence presented at trial of Kaiser's actual knowledge of the fraudulent PA income scheme and the resulting overstatements of USF's income." Kaiser, who has the burden to show prejudice, does not argue that the government relied on a theory of conscious avoidance at trial or in summation; indeed, Kaiser's counsel opposed a conscious avoidance instruction on the ground that the government had not advanced the theory. But once the conscious avoidance theory was charged, it provided a possible basis for Kaiser's conviction, and we must consider whether the instructional error affected Kaiser's substantial rights.

Kaiser argues that most of the government's transcript citations are to the testimony of unreliable cooperators Tim Lee and Gordon Redgate. Kaiser further contends that, as Chief Marketing Officer during the time period in question, his role was limited to assisting with audits, and that he relied on documents provided by the Purchasing Department, which was under Lee's authority. Kaiser argues that the documentary evidence and testimony of other witnesses pertained mainly to uncontested events and is not inculpatory unless the testimony of cooperators is credited.

We agree that the other evidence presented by the government, if examined apart from Lee and Redgate's testimony, is consistent with both the government's theory and Kaiser's assertion that he relied on information about promotional allowances from Lee and was not aware of the fraud. The exhibits cited by Kaiser demonstrate that Kaiser was directly involved in relatively few contracts, and therefore could have been unaware that a large number of written agreements were signed containing prepayment terms. The erroneous confirmation letters sent by Kaiser are also inculpatory documentary evidence, but Kaiser argues that he got the information from Lee, and trusted that the PA amounts were "best estimates." The side letters from Kaiser used only this "best estimates" language and did not forgive any purported debts, unlike the side letters drafted by Carter.

Moreover, there was ample reason for the jury to question the credibility of the government's witnesses. Lee testified that after the fraud was discovered, he and USF's CEO, Jim Miller, discussed pinning the blame on Kaiser. Lee and Redgate were close friends and roommates and Carter testified that it is "probably true" that he was "Mr. Lee's most loyal person inside the company." Kaiser's theory that he was designated as the scapegoat when the scheme began to unravel is plausible in light of this evidence.

Given the foregoing, there is a reasonable probability that the jury convicted Kaiser on a conscious avoidance theory and that the jury would not have done so but for the instructional error. See Marcus, 2010 WL 2025203, at *3. We moreover conclude that the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id.; cf. United States v. Cotton, 535 U.S. 625, 632-33 (2002) (finding that error did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings" where evidence on affected element was

16

"overwhelming" and "essentially uncontroverted"); United States v. Garcia, 587 F.3d 509, 521

(2d Cir. 2009) (finding that error "seriously affect[ed] the fairness, integrity of pubic reputation

of judicial proceedings" where defendant was convicted of an offense of which there was a

"substantial possibility" that he was not guilty"). Accordingly, we order a new trial. We address

the other issues raised in Kaiser's appeal in order to give guidance to the district court on

remand.

## 2. Willfulness

Judge Griesa instructed the jury that the required mental state for securities fraud was that

Kaiser "acted knowingly and with intent to deceive," and elaborated as follows:

> In order to convict the defendant, you must find that he knew that false statements
> were being made, false information was being incorporated into the earnings
> results and the accounts receivable results, that he knew that the promotional
> allowance figures were being inflated, and that he did this with intent to cause a
> deception, a falsification. Now this means that he cannot be convicted of mistake,
> he cannot be convicted if he in good faith thought that these results were correct,
> even though they turned out not to be correct. And the government must prove
> the contrary of the idea of mistake or good faith belief. The government must
> prove, as set forth here, that he knew of the false and fraudulent inflation of the
> promotional allowance figures, he knew of the false and fraudulent inflation of
> earnings as a result and accounts receivable as a result and that he did that with
> intent to create a deception.

Kaiser argues that the district court erred in failing to instruct the jury that "willfulness" required

knowledge of illegality.[2] We do not agree, however, that "willfulness" requires proof that the

defendant knew that his actions were illegal.

---

[2] Both parties requested that Judge Griesa instruct the jury that willfulness required knowledge
of illegality. Judge Griesa did not give the proposed instruction, and did not rule on the proposed
instructions before giving the charge, calling the practice "a waste of time." Because Kaiser
failed to object after Judge Griesa charged the jury, we review the jury instruction for plain error.
Fed. R. Crim. P. 30(d).

The Securities Exchange Act of 1934 criminalizes only "willful" violations of its provisions. 15 U.S.C. § 78ff(a); United States v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005). With respect to misstatements in public filings, the defendant must have also acted with knowledge of the falsity of the statement. See 15 U.S.C. § 78ff(a). But the government is not required to present "[p]roof of a specific intent to violate the law . . . to uphold a conviction under § 32(a) of the Act, provided that satisfactory proof is established that the defendant intended to commit the act prohibited." United States v. Schwartz, 464 F.2d 499, 509 (2d Cir. 1972). Instead, a defendant may raise the defense that he did not know the law to avoid imprisonment. See 15 U.S.C. § 78ff(a) ("[N]o person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.").

In view of this unique statutory language, we have held that, whatever "willful" might mean for purposes of other statutes, for the purposes of Section 32(a), it does not encompass the requirement that a defendant knew he was violating the law. United States v. Dixon, 536 F.2d 1388, 1395 (2d Cir. 1976) ("A person can willfully violate an SEC rule even if he does not know of its existence" (quoting United States v. Peltz, 433 F.2d 48, 54 (2d Cir. 1970)); see also United States v. Tarallo, 380 F.3d 1174, 1188 (9th Cir. 2004) ("Under our jurisprudence, . . . 'willfully' as it is used in § 78ff(a) means intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful."); United States v. O'Hagan, 139 F.3d 641, 647 (8th Cir. 1998) ("Courts that have interpreted 'willfully' in § [78ff] have reached the same conclusion that we reach in this case: 'willfully' simply requires the intentional doing of the wrongful acts – no knowledge of the rule

18

or regulation is required.").

In Peltz, the defendant was charged with illegal short selling, an offense that required a "willful" state of mind. 433 F.2d at 54. To satisfy the willfulness element, this Court held that it was sufficient that the defendant had made statements to his brokers about owning stock that the defendant knew were false. Id. at 55. We held that Peltz could not avail himself of Section 32(a) because he had made "no effort to bring himself within this proviso." Id. at 55 & n.7. Likewise, Kaiser never requested an instruction on this defense or attempted to meet his burden of proving ignorance of the securities laws.

In Dixon, the defendant faced charges of failing to disclose in certain SEC statements that his corporation had loaned him money. 536 F.2d at 1395. Dixon had recorded his debts on the corporate books under the names of other individuals, knowing that those debts were in fact his own. Id. at 1396. At trial, Dixon did "not deny his knowledge that there were SEC rules requiring the reporting of loans to officers." Id. at 1395. Rather, Dixon contended that he had been incorrectly informed that so long as he had paid back most of the loan by the end of the year, he was exempted from the disclosure rule. Id. We concluded that this was not a "case of a defendant manifesting an honest belief that he was complying with the law." Id. at 1396. Dixon acted willfully by misstating who had taken out the loans in the corporate books – this was a "wrongful act," in the sense of that term in Peltz. Id. Judge Friendly wrote for the Court:

> Dixon may have thought his year-end thimblerig would provide escape from a rule different from the one that existed. But such acts are wrongful "under the Securities Acts" if they lead, as here, to the very violations that would have been prevented if the defendant had acted with the aim of scrupulously obeying the rules (which would have necessarily involved correctly ascertaining them) rather than of avoiding them. Such an intention to deceive is enough to meet the modest requirements of the first clause of section 32(a) when violations occur.

19

Id.

More recently, we seemed to endorse a higher standard for willfulness in insider trading cases, stating that willfulness requires

> "a realization on the defendant's part that he was doing a wrongful act" *under the securities laws*, United States v. Peltz, 433 F.2d 48, 55 (2d Cir.1970), in a situation where . . . "'the knowingly wrongful act involved a significant risk of effecting the violation that has occurred,'" Metromedia Co. v. Fugazy, 983 F.2d 350, 364 (2d Cir. 1992) (quoting Peltz, 433 F.2d at 55).

Cassese, 428 F.3d at 98 (emphasis added). The majority in Cassese did not reach the question of whether willfulness required only awareness of general unlawfulness or whether it required that the defendant knowingly commit the specific violation charged, finding that the government had failed to sustain its burden "even under the more relaxed definition of willfulness." Id. at 95. Judge Raggi dissented in Cassese, writing that under Peltz, the government must only prove "the defendant's awareness of the general unlawfulness of his conduct," and concluding that the government had met its burden. 428 F.3d at 109 (Raggi, J., dissenting).

Whatever the gloss put on Peltz and Dixon by Cassese in insider trading cases, as a general matter, we conclude that Peltz and Dixon do not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct. Unlike securities fraud, insider trading does not necessarily involve deception, and it is easy to imagine an insider trader who receives a tip and is unaware that his conduct was illegal and therefore wrongful. The same cannot be said of one who deliberately misleads investors about a security.

In this case, the jury was charged that they had to find that Kaiser knew the statements were "false and fraudulent" and that he made those statements "with intent to create a

20

deception," and the government had to prove "the contrary of the idea of mistake or good faith." For the jury to have found that Kaiser possessed such an intent, it follows necessarily that it also concluded that there was "'a realization on the defendant's part that he was doing a wrongful act.'" Dixon, 536 F.2d at 1395; cf. United States v. Tucker, 345 F.3d 320, 335 (5th Cir. 2003) (affirming conviction where jury was charged that government was required to prove that the defendant acted "knowingly *or* willfully," instead of "knowingly *and* willfully," finding, among other things, that "the district court's placement of the definition of 'intent to defraud' immediately following the elements of the [securities fraud] count effaced any confusion the jury might have encountered concerning the requisite *mens rea*"). We conclude that the district court's instruction on the meaning of "knowingly and with intent to deceive" necessarily encompassed a finding of willfulness under Section 32(a).

**B.      Rule 404(b)**

Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts" may be admissible for certain purposes, "provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

Kaiser argues that the government failed to give him the required notice of Rule 404(b) evidence of "other crimes" that occurred before the charged period of the conspiracy from April 2000 to March 2003. We conclude that the pre-April 2000 evidence did not constitute "other crimes" evidence and, therefore, that the government did not run afoul of the notice requirement under Rule 404(b).

We have previously analyzed evidence of acts occurring prior to the charged period of the conspiracy, offered only to show the background of a conspiracy, as "other crimes" evidence subject to Federal Rule of Evidence 404(b).  See United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992).  However, evidence of uncharged criminal activity is not considered "other crimes" evidence "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000).

The government argues that the pre-April 2000 evidence was "direct proof of the charged conspiracy" and therefore did not fall under Rule 404(b).  It notes that income USF recorded prior to April 2000 had carry-over effects on Ahold's subsequent financial statements because USF's PA rate was calculated at a rate based on PA income in prior years.  Furthermore, the government argues that the terms of many pre-April 2000 agreements extended into subsequent years, and that Kaiser's alleged lie to auditors about the existence of written contracts and prepayment terms depends on its claim that Kaiser knew about these contracts from his pre-April 2000 experience.  Finally, the government argues that the scheme itself was devised by Kaiser prior to April 2000.  Lee testified that the measures he took to disguise the real amount of PA income during the post-April 2000 period – such as the manipulation of the PA rate, the drafting of false confirmation letters, the use of false and unauthorized PA deductions, and lies to auditors – were methods devised by Kaiser before April 2000.

We agree that the pre-April 2000 evidence was "inextricably intertwined with the evidence regarding the charged offense."  Carboni, 204 F.3d at 44.  At trial, Kaiser pointed to the

22

1999 Puritan Chemical deal as an example of a pre-April 2000 prepayment that was ultimately

accounted for properly, and therefore had no continuing effects on the charged crimes.  However,

the Puritan Chemical deal continued to have bearing on whether Kaiser lied to auditors about the

existence of prepayments and written contracts.  And like other contracts signed before April

2000, the Puritan Chemical agreement affected the PA rate, which, according to the government,

Kaiser calculated.  We agree with Judge Griesa's comment at oral argument on Kaiser's

post-trial motion that  "[i]twould have been impossible to intelligibly present a case about much

of what went on after April of 2000 without starting at the beginning."[3]  Judge Griesa did not err

in permitting the government to introduce pre-April 2000 evidence as part of its case.

## C.      Hearsay Testimony

Kaiser next argues that the district court improperly admitted the following testimony

from Lee about the $18.5 million prepayment on the Puritan Chemical PA agreement in 1999:

> Mr. Miller [then-CEO of USF] had a conversation with me and had said that Mr.
> Abramson, who is the chief general counsel at [USF], had found out that Mr.
> Kaiser had taken the 18 and a half million dollar prepayment and had taken it all
> to income at one time, and that Mr. Abramson was very upset and wanted to go to
> the SEC to expose the fact that Mr. Kaiser had taken it to income.

Lee also testified that as a result of this issue, "Mr. Miller told me that he

had to sell the company to Ahold because of Mr. Kaiser."

Kaiser's counsel objected to this testimony on the ground that it was double hearsay –

---

[3]  Even if we were to conclude that the pre-April 2000 evidence was "other crimes" evidence under Rule 404(b), we would find that Kaiser received adequate notice that the government intended to introduce the pre-April 2000 evidence at trial.  The government's March 15, 2006 indictment contained numerous references to events occurring prior to April 2000.  The indictment, in conjunction with the materials disclosed by the government in pre-trial discovery, was more than sufficient to put Kaiser on notice that the government intended to introduce evidence concerning his pre-April 2000 actions.

neither Miller nor Abramson testified. The government responded that Miller was an unindicted coconspirator, and that the statement was in furtherance of the conspiracy. See Fed. R. Evid. 801(d)(2)(E). Judge Greisa then asked, "if we just have testimony about Abramson believing this was wrong and wanting to go to the SEC, what's the basis for admitting that?" Defense counsel argued that Abramson was not a co-conspirator and that Abramson's statement that he wanted to "blow the whistle" was "in contravention of the conspiracy." Judge Griesa concluded:

> If Abramson's statement were the only source of information in the record as to what was done about the prepayment . . . then that would be a real problem. But . . . the information about what was done doesn't come from Abramson. Abramson is cited here as wanting to expose this. And then the question is what did Lee and Miller do about it.

He ruled that when used for the limited purpose of explaining Lee and Miller's subsequent actions, Abramson's statement was admissible.

## 1. Admissibility

The government argues that the statement was not hearsay because it was not offered for the truth of the matters asserted: (1) that Kaiser attempted to record the Puritan prepayment as income or (2) that his conduct was sufficiently culpable to warrant a report to the SEC. Instead, the government argues that Lee's testimony was relevant to show that Miller and Lee, two of Kaiser's co-conspirators, knew that the Puritan transaction had been accounted for improperly and recognized that measures had to be taken to mask that impropriety.

We disagree with the government's characterization of the purpose for which the evidence was offered. During summation, the government relied on Abramson's statement to refute Kaiser's assertion that the Puritan deal was proper because it was approved by lawyers, arguing that Abramson's "threat[] to report . . . Kaiser to the SEC" was "all you need to know

24

about whether the lawyers approved USF taking the full $18.5 million into income right away."

The government also argued that Kaiser took measures to properly account for the Puritan prepayment as a result of Abramson's threat. Both of these arguments depended on the truth of Abramsom's statement – that he believed the Puritan prepayment improper and wanted to report Kaiser to the SEC.[4]

The government makes several other arguments about the admissibility of Abramson's statement that we also reject. First, the government argues that Lee's testimony did not relay any "assertion" by Abramson, rather, it was "an observation expressed by Miller of his understanding or concern that Abramson was going to report Kaiser's conduct to the SEC." This clever characterization of Lee's testimony, however, is belied by the record. Lee testified on cross-examination that Miller was communicating "comments" that Abramson had made to Miller. It is clear from Lee's testimony that he was recounting Abramson's statement to Miller, not merely Miller's "understanding" of Abramson's concerns.

Second, the government argues that to the extent there was an assertion it was one of Abramson's intent and "[a] statement of the declarant's then existing state of mind . . . such as intent" is "not excluded by the hearsay rule." Fed. R. Evid. 803(3); see also United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to

---

[4] The government also argues that it was permitted to introduce the statement to rebut the claim by Kesler, the Deloitte auditor, who testified that the Puritan prepayment was ultimately verified. The "opening the door" principle of admissibility allows a party to introduce otherwise inadmissible evidence "when the opposing party has introduced inadmissible evidence on the same issue." Forrester, 60 F.3d at 60-61 (quotation marks omitted). There are two reasons that this principle is not applicable here. First, it was the government, not Kaiser, who called Kesler to the stand and elicited his testimony on the Puritan deal. Second, the government has not argued that Kesler's testimony was in any way inadmissible.

perform a certain act in the future is not excludable on hearsay grounds."). However, the obvious premise of the statement is that Kaiser was violating the law. It is this assertion, and not Abramson's intent to report Kaiser to the SEC, that constitutes inadmissible hearsay.

Moreover, even if we agreed that the statement was not hearsay or fell within a hearsay exception, the statement should have been excluded pursuant to Federal Rule of Evidence 403. "[T]he mere identification of a relevant non-hearsay use of [the] evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice." United States v. Reyes, 18 F.3d 65, 70 (2d Cir. 1994). Such evidence is not admissible if "the probative value of [the] evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement." Id. Here, there is no doubt that Abramson's statement that he wanted to report Kaiser to the SEC was highly prejudicial. First, Abramson's statement went directly to an "important disputed issue" in the case: whether Kaiser knowingly sought to improperly account for the Puritan prepayment. United States v. Forrester, 60 F.3d 52, 62 (2d Cir. 1995); Reyes, 18 F.3d at 70. Second, the jury could have concluded that Abramson – who had never been charged with a crime – was a knowledgeable and credible source about Kaiser's involvement and culpability. Forrester, 60 F.3d at 62 (prejudice where out-of-court statement by "knowledgeable speaker" with "no apparent motive to lie"). Finally, it did not help that Abramson's statement could not be tested by cross-examination and that the district court refused to give a limiting instruction to the jury that could have minimized any resulting prejudice.[5]

_____

[5] Kaiser did not request a limiting instruction, but can be excused for this failure because Judge Griesa raised the issue sua sponte and rejected it himself.

26

Reyes, 18 F.3d at 71; Forrester, 60 F.3d at 62.

Balanced against these factors is the relatively limited relevance of Abramson's statement for the government's case. Reyes, 18 F.3d at 70. Lee admitted his awareness that the accounting was improper; Abramson's statement was therefore not necessary to show Lee's state of mind. Id. (finding relevant whether "the needed explanation of background or state of mind [can] be adequately communicated by other less prejudicial evidence or by instructions"). It is true that Abramson's statement could explain why Kaiser decided to take measures to hide the Puritan prepayment, and why the prepayment was ultimately accounted for properly on USF's books. But the jury could not have accepted the statement for this purpose unless it found Abramson's statement concerning Kaiser's involvement to be true, that is, unless the jury considered the statement for the truth of the matter asserted. See United States v. Abreu, 342 F.3d 183, 190 (2d Cir. 2003) (holding that a non-hearsay purpose that depends on the truth of the matter asserted is still hearsay).

**2.      Harmless Error**

Because Kaiser objected to the admission of the testimony at trial, the government has the burden to prove that the error was harmless. "Error is harmless if it is 'highly probable' that it did not contribute to the verdict." Forrester, 60 F.3d at 64. The government argues that any error was harmless because

> (1) the testimony was only a limited part of the evidence relating to the Puritan prepayment; (2) the prepayment was only part of the evidence relating to the formation and execution of the fraudulent scheme prior to the Ahold acquisition; and (3) in the end, Judge Griesa instructed the jury that all such pre-acquisition evidence was only relevant as background and as proof of knowledge and intent.

We conclude that the error was not harmless for largely the same reasons that we found the

27

testimony was prejudicial. Although the government presented other evidence concerning Kaiser's role in the Puritan prepayment, most of this evidence was in the form of testimony of Kaiser's alleged co-conspirators. The jury may have given more credence to a statement by Abramson – not himself a member of the conspiracy – about Kaiser's role in the conspiracy.

Moreover, while the Puritan prepayment was only one transaction in a much larger scheme, it played a disproportionate role in the government's case because it was one of the few PA agreements for which there was uncontroverted evidence of Kaiser's involvement. Finally, Judge Griesa's limiting instruction about pre-acquisition evidence did not render the error harmless. Kaiser's knowledge and intent were the central issues in the case and formed the basis of Kaiser's defense. Abramson's statement was directly relevant to these issues. In sum, we cannot say that it is "highly probable" that Lee's testimony concerning Abramson's statement did not contribute to the jury's verdict.

**D. Redgate's Planners**

Kaiser's final claim challenging his conviction on appeal is that the district court improperly admitted Gordon Redgate's business planners into evidence under Rule 803(6) of the Federal Rules of Evidence, which is the "business records exception" to the hearsay rule. The government argues that the planners were admissible not only as business records, but also as prior consistent statements and co-conspirator statements. Because we conclude that the planners were properly admitted under the business records exception, we do not reach the government's other arguments.

The business records exception to the hearsay rule provides for the admission of:

A memorandum, report, record, or data compilation, in any form, of acts, events,

28

conditions, opinions . . . made at or near the time by . . . a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness. . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6). The purpose of the rule is to ensure that documents were not created for "personal purpose[s] . . . or in anticipation of any litigation" so that the creator of the document "had no motive to falsify the record in question." United States v. Freidin, 849 F.2d 716, 719 (2d Cir. 1988). "We have stated that Rule 803(6) 'favors the admission of evidence rather than its exclusion if it has any probative value at all.'" United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (quoting In re Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir.1981)).

Since 1997, Gordon Redgate maintained business planners in which he made contemporaneous handwritten entries related to his two companies. The planners included contact log pages with preprinted spaces for recording notes pertaining to phone conversations. During 2001, 2002, and 2003, Redgate kept notes on conversations with Kaiser regarding false confirmation letters that Kaiser asked him to send. Judge Griesa overruled Kaiser's objection and admitted the planners, stating, "part of his business was to sign these confirmations, and these are records of the conversations he had in connection with that part of his business. So it seems to me these are unquestionably business records."

## 1. Regular Practice

Kaiser argues that Redgate's note-taking on telephone conversations was not a "regular practice," and that he recorded the conversations to give himself cover in the event the fraud was exposed. United States v. Freidin, 849 F.2d 716, 723 (2d Cir. 1988) (holding that the "regular

29

practice" requirement must be met to admit a business record, even if the court determines for other reasons that the document is sufficiently trustworthy). Kaiser argues that Redgate's note-taking was too sporadic and selective to meet this standard, citing testimony from Redgate on cross-examination that he only wrote down "highlights" and matters he perceived to be "important."

The selectivity that Kaiser points out, however, is the nature of all note-taking. A business record need not be mechanically generated to be part of a "regular practice." Redgate's contact log is different in kind from the types of "miscellaneous jottings" that courts have found inadmissible under this exception, because it was maintained in a consistent way and was focused on a certain range of issues that were relevant to his business. Cf. United States v. Ramsey, 785 F.2d 184, 192 (7th Cir. 1986) ("Occasional desk calendars, in which entries may or may not appear at the whim of the writer, do not have the sort of regularity that supports a reliable inference.").

This Court has allowed the admission of calendars as business records where the witnesses testified that "his regular business practice was to keep a calendar in which he documented events of which he had personal knowledge at or near the time they occurred." United States v. Ford, 435 F.3d 204, 214-15 (2d Cir. 2006). Redgate's business planners are similar enough to these calenders, in our view, to fall within the scope of the business records exception.[6]

---

[6] Kaiser makes a number of other, nearly frivolous arguments on this issue, for example, that Redgate's calendar entries were "personal" and not business related. A review of the exhibits reveals only business-related entries. Kaiser also argues that "the clandestine and 'unusual' conversations [Redgate] allegedly recorded are the very definition of *irregular* business activities." It is of no consequence that the fraud was not a regular business activity. All that

**2.       Trustworthiness**

Kaiser also argues that Redgate's planners were not sufficiently trustworthy to serve the purpose of the business records exception due to a discrepancy between Redgate's testimony on direct and redirect examination. Kaiser's theory at trial was that Redgate had time and opportunity to alter the planners before turning them over to his attorney. He argued that Redgate's inconsistent testimony supports this theory.

On direct examination, Redgate testified that he turned over most of the pages from his Contact Logs to his attorney on February 13, 2003 – the day after he learned that the fraud had unraveled and Lee had tendered his resignation to USF – and his attorney had told him his "problems were significantly greater than worrying about owing money, and . . . these were important records, and that he should hold on to them." The attorney took everything except "[o]ne page of the contact log that had 2002 stuff on it and two conversations, I believe, in 2003 that they overlooked." The missing page includes notes from December 27, 2002 through January 14, 2003. At first, Kaiser testified that it was not turned over to his lawyer because it was in his current planner at the time he met with his lawyer on February 13, 2003. The missing page was later turned over to the government, at the earliest in May 2003.

On cross examination, Kaiser's counsel pointed out there were three subsequent pages of the planner with entries spanning from January 20, 2003 to March 2, 2003. Because the last page had entries after February 13, 2003, the date on which Redgate met with his attorney, it could not have been turned over at that time. Redgate responded, "Evidently he didn't take it." On redirect, Redgate changed his testimony. He claimed that the only page not received by his

matters is that Redgate's note-taking was a regular business activity.

31

lawyer on February 13, 2003 was not the page he had mentioned on direct examination, containing the entries that spanned 2002 and 2003, but rather, was the last page of the notes, covering the period from February 6, 2003 to March 2, 2003.

Kaiser has succeeded in raising questions about the trustworthiness of the planners, but he has failed to show that the district court abused its discretion in finding that the they were sufficiently trustworthy under Rule 803(6). The district court was entitled to rely on Redgate's testimony on redirect to making its evidentiary decision. Reyes, 157 F.3d at 953. "Residual doubts on the question [of trustworthiness] would go to the weight of the evidence, not its admissibility." Id.

We further observe that the "degree of reliability necessary for admission is greatly reduced where, as here, the declarant is testifying and is available for cross-examination, thereby satisfying the central concern of the hearsay rule." See United States v. McPartlin, 595 F.2d 1321, 1350-51 (7th Cir. 1979). We cannot say, therefore, that the district court's reliance on Redgate's testimony was in error.

### III. CONCLUSION

For the foregoing reasons, the matter is **VACATED** and **REMANDED** to the district court for a new trial. Because we find that the trial was flawed, we do not reach Kaiser's various challenges to his sentencing.