09-4361-cr (L)
US v. Quinones

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2010

(Argued: January 19, 2011          Decided: March 29, 2011)

————————————————————————————

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

HERMAN QUINONES, ANTONIO QUINONES,

*Defendants-Appellants*.

Docket Nos. 09-4361-cr (L), 10-0333-cr (con)

————————————————————————————

B e f o r e : WALKER, STRAUB, KATZMANN, *Circuit Judges*.

————————————

Appeal from judgments of the United States District Court for the Eastern District of New York (Block, *J.*), entered on October 15 and November 23, 2009, following a jury trial, convicting Defendant-Appellant Herman Quinones of distribution of controlled substances, and convicting Defendant-Appellant Antonio Quinones of conspiracy to distribute and possess with intent to distribute controlled substances, distribution of controlled substances, and money laundering conspiracy. We hold that any error in giving a conscious avoidance jury instruction was not prejudicial to the defendants because there was overwhelming evidence that the defendants knew or reasonably should have known that the doctors and pharmacists upon whom they relied were acting in bad faith. We further hold that *United States v. Santos*, 553 U.S. 507 (2008), as applied to the sale of contraband, permits a conviction for money laundering conspiracy even absent proof

that the laundered funds were profits. For the reasons stated below and in the accompanying summary order, the judgments of the district court are **AFFIRMED**.

Judge Straub dissents in part and concurs in part in a separate opinion.

_____

STEPHEN J. MEYER, Assistant United States Attorney (Emily Berger, Laura Mantell, and Todd Kaminsky, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., *for Appellee.*

PAUL MORRIS, Law Offices of Paul Morris, P.A., Miami, Fla., *for Defendant-Appellant Herman Quinones.*

PAUL MORRIS, Law Offices of Paul Morris, P.A., Miami, Fla. (Stephen H. Rosen, Stephen H. Rosen, P.A., Coral Gables, Fla., *on the brief*), *for Defendant-Appellant Antonio Quinones.*

_____

KATZMANN, *Circuit Judge*:

Defendants-Appellants Antonio and Herman Quinones appeal from judgments of the United States District Court for the Eastern District of New York (Block, *J.*), entered on October 15 and November 23, 2009, following a jury trial, convicting Herman Quinones ("Herman") of distribution of controlled substances, and convicting Antonio Quinones ("Antonio") of conspiracy to distribute and possess with intent to distribute controlled substances, distribution of controlled substances, and money laundering conspiracy. This appeal calls upon us to decide whether (1) any error in giving a conscious avoidance jury instruction was prejudicial to the defendants and thus warranted a new trial, and (2) under *United States v. Santos*, 553 U.S. 507 (2008), the government must prove that the laundered funds at issue in this case were the profits,

rather than merely the gross revenues, of Antonio's prescription drug sales enterprise.[1]  As set forth below, we hold that any error in instructing the jury on a conscious avoidance theory was not prejudicial to the defendants because there was overwhelming evidence presented at trial that the defendants knew or reasonably should have known that the doctors and pharmacists upon whom they relied were acting in bad faith.  We further hold that *Santos*, as applied to the sale of contraband, permits a conviction for money laundering conspiracy even absent proof that the laundered funds were profits, and accordingly affirm Antonio's conviction on this count.  For the reasons stated herein and in the accompanying summary order, the judgments of the district court are **AFFIRMED**.


## BACKGROUND

The facts of this case are largely undisputed.  The evidence at trial showed that Antonio entered the Internet pharmacy business in 2002, when he purchased Prescriptions & Travel, a pharmacy that filled prescriptions for an Internet pharmacy known as RX Networks.  Vincent Chhabra, an Internet pharmacy entrepreneur, owned RX Networks.  Antonio later hired Steven Mahana, a website developer, to copy Chhabra's website design and the system that Chhabra used to manage medication orders.

---

[1] In an accompanying summary order, we address and reject Antonio Quinones's additional argument that the district court erred in refusing to charge the jury on an advice of counsel defense and in prohibiting counsel from arguing the defense in summation and Herman Quinones's additional arguments that the district court (1) improperly admitted testimony of a person who purchased drugs through an Internet website, (2) improperly denied the defendants' motion to suppress evidence obtained by wiretaps, and (3) erroneously refused to grant immunity to a potential defense witness.

Antonio's operation worked as follows: An Internet user who searched for a prescription medication would be directed by a search engine to Antonio's website. Once at the website, the customer would select his drug and provide payment information and delivery instructions. The customer would also fill out a brief medical questionnaire, which asked the customer for his name, gender, weight, allergies, current medications, reason for requesting the medication, and known medical conditions. The questionnaire was the same regardless of whether a drug required a prescription. The customer's order then would be transmitted to a so-called "Doctor's Module," whereby the questionnaire would be reviewed by a doctor who would approve or disapprove the order. Antonio selected the doctors who reviewed the questionnaires and approved orders made on his websites. The doctors, who were paid per questionnaire reviewed, often reviewed over a hundred applications per day. Once a doctor approved an order, it would be transmitted to a licensed physical pharmacy controlled by Antonio that filled the prescription. Antonio's pharmacies typically filled one thousand orders per day and shipped the ordered medications to customers by Federal Express.

Antonio's system permitted no interaction whatsoever between a doctor and a customer. In fact, Mahana placed a disclaimer on his invoices to Antonio stating that the system did not provide a sufficient basis to establish a relationship between a doctor and a patient in order to prescribe medication. Moreover, the system provided few safeguards against substance abuse. For example, some customers were able to obtain excessive amounts of medications by placing orders to the same address using different names. Others were able to receive drugs even though they did not provide all of the information required by the questionnaire.

Mahana, who built twenty-five to thirty websites for Antonio, referred to Antonio's network of websites as the "administrative back-end" — a "piece of software that is designed to control all aspects of the website or multiple websites." Gov't App. 28. Through the "back-end," Antonio controlled, among other things, the approval of prescription medication orders even without the involvement of physicians. As administrator of the system, he had access to detailed reports about operation of his websites and the manner in which prescriptions were filled. Antonio used the "back-end" also to charge a filling fee for each prescription, a referral fee for access to doctors, and a "per accepted order" fee for each order received by an affiliate of his network. Antonio's son, Herman, filled orders for his father's websites and ran his father's Internet pharmacy customer service call center. Eventually, Herman obtained his own website, 888meds.com, which was connected to the back-end.

Moreover, Antonio used corporations, owned by relatives and friends, to buy medicine from wholesalers, receive payments from affiliated websites, and manage the customer service call center for his Internet pharmacies. He used a company known as My Rainbow Marketing ("My Rainbow"), which was nominally owned by his sister-in-law, Susana Mendez, to buy medicine from wholesale pharmaceutical distributors and to bill websites for medications that Antonio supplied and the filling fees that he charged. Defense counsel conceded in summation that My Rainbow was in fact controlled by Antonio. In addition, Thundergames, a corporation owned by Antonio's long-time friend, was the legal entity that ran the customer call center for Antonio's websites.

In November 2003, Chhabra was arrested and charged with illegal distribution of controlled substances. Immediately following Chhabra's arrest, Antonio stopped using

Prescriptions & Travel to fill orders for his websites and took steps to liquidate its assets. He

began using a new filling pharmacy, Innovative Remedies, which was located in Florida. In the

following months, however, Antonio learned that a proposed change in Florida law would

require face-to-face contact between a physician and patient, so he moved his filling pharmacy to

Queens. Antonio continued to move his operations to new locations as law enforcement raided

or shuttered his filling pharmacies. In all, Antonio used approximately a dozen different

pharmacies to fill prescription orders.

In December 2007, Antonio and Herman were indicted on three counts: (1) conspiracy to

distribute and possess with intent to distribute Schedule III and IV controlled substances without

valid prescriptions through the Internet in violation of 21 U.S.C. §§ 841(a)(1) and 846, (2)

distribution of Schedule III and IV controlled substances in violation of 21 U.S.C. § 841(a)(1),

and (3) money laundering conspiracy in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i),

and (h). At the close of the government's case, the defendants moved pursuant to Rule 29 to

dismiss the third count based upon the Supreme Court's holding in *United States v. Santos*, 553

U.S. 507 (2008). The district court denied that motion. Over defense counsel's objection, the

court instructed the jury on a conscious avoidance theory in connection with the knowledge

requirement of the unlawful distribution of controlled substances counts.[2] The jury found

Antonio guilty on all counts. It found Herman guilty of distribution of controlled substances.

The district court sentenced Antonio and Herman principally to terms of imprisonment of ninety-

seven and eighteen months, respectively. This appeal followed.

---

[2] Title 21, section 841(a) of the United States Code provides that "it shall be unlawful for any person *knowingly or intentionally* . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." (emphasis added).

**DISCUSSION**

On appeal, the defendants argue that they are entitled to a new trial on the ground that the district court improperly instructed the jury on a conscious avoidance theory. Antonio argues also that his conviction of money laundering conspiracy must be reversed on the ground that the government was required to prove the laundered funds at issue in this case were the profits, rather than merely the gross revenues, of his prescription drug sales enterprise.

**I.      Conscious Avoidance**

We turn first to the defendants' argument that the conscious avoidance charge was improper. "A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact." *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000); *see also United States v. Gabriel*, 125 F.3d 89, 98 (2d Cir. 1997) ("A conscious-avoidance instruction is appropriate when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate indifference.") (internal quotation marks omitted).

Our analysis begins with the knowledge requirement of the controlled-substance distribution crime. A doctor may be convicted of unlawful distribution and dispensation of a controlled substance if his "activities fall outside the usual course of professional practice." *United States v. Moore*, 423 U.S. 122, 124 (1975); *see also* 21 C.F.R. § 1306.04(a) (providing that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice"). A lay

defendant likewise may be convicted of unlawful distribution of a controlled substance where the defendant relies upon a doctor's prescription that he knows or reasonably should have known was invalid. *See United States v. Vamos*, 797 F.2d 1146, 1153 (2d Cir. 1986) ("[W]hile those who assist practitioners in distributing controlled drugs clearly cannot be held to the standard of a reasonable practitioner, they are not free to unreasonably rely on the judgment of their employers."). Thus, to convict the defendants of unlawful distribution of controlled substances, the jury must have found that they knew or reasonably should have known that the doctors and pharmacists were distributing controlled substances outside the usual course of professional practice and without a legitimate medical purpose — or, in other words, that these professionals acted in "bad faith." *Id.*

At oral argument, the defendants indeed conceded that because they claim to have relied upon the determinations of doctors and pharmacists, they could be convicted if the jury found that they were aware, or reasonably should have been aware, that the doctors and pharmacists were acting in bad faith. *See Vamos*, 797 F.2d at 1152-53. The district court therefore correctly charged the jury that "you must find the defendant not guilty unless the government proves beyond a reasonable doubt that the defendant knew *or reasonably should have known* that the doctors and pharmacists were not acting in good faith." Gov't App. 539 (emphasis added).

On appeal, the defendants argue that they are entitled to a new trial because there was an insufficient factual predicate for a conscious avoidance instruction and, in any event, the instruction was improperly worded. Even if their contentions have merit, however, the salient question is whether any error would have been prejudicial to the defendants. *See, e.g.*, *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). Any error in giving a conscious

avoidance instruction is harmless where there is "overwhelming evidence" that the defendants possessed the requisite knowledge. *See id.* at 171 (internal quotation marks omitted).

The defendants rejoin that error is harmless only if the government has adduced overwhelming evidence of the defendants' actual knowledge that the doctors and pharmacists were not acting in good faith, as indicated by *United States v. Kaiser*, 609 F.3d 556, 566-67 (2d Cir. 2010) (vacating conviction where "there is a reasonable probability that the jury convicted Kaiser on a conscious avoidance theory and that the jury would not have done so but for the instructional error"). This case, however, is easily distinguishable from *Kaiser*, where a conscious avoidance charge was erroneously presented as a basis upon which the jury could find knowledge of the existence of a fact where the defendant's lack of "actual belief" in the existence of that fact would require acquittal, even if that belief were unreasonable. *Id.* at 566. Here, by contrast, the government requested and obtained a conscious avoidance charge as an alternative means of proving "what defendant[]s knew *or reasonably should have known*." Gov't App. 539 (emphasis added). Unlike in *Kaiser*, the defendants' actual but unreasonable belief in the existence of a fact — here, the doctors' and pharmacists' good faith — could not absolve the defendants of culpability. *Cf.* 609 F.3d at 566 (stating that "actual belief would absolve Kaiser of culpability," even if that actual belief were unreasonable or negligent). In other words, even if the jury found that the defendants actually believed that the doctors and pharmacists were acting in good faith, it still would convict if it found that their belief was unreasonable.

Accordingly, the fundamental question here is whether the government adduced overwhelming evidence that the defendants knew or reasonably should have known that the

-9-

doctors and pharmacists on whom they relied were acting in bad faith. Upon our review of the record, we find overwhelming evidence that the defendants possessed the requisite knowledge in this case.

First of all, there is no dispute that the defendants were aware that their online pharmacy permitted no interaction whatsoever between a customer and a doctor. In fact, Mahana placed a disclaimer on his invoices to Antonio stating that the system did not provide a sufficient basis to establish a relationship between a doctor and a patient in order to prescribe medication. Antonio, who controlled and monitored all aspects of his business through the back-end, selected the doctors who reviewed customers' questionnaires and approved orders made on his websites. The doctors, who were paid per questionnaire reviewed, often reviewed over a hundred applications per day, and Antonio's pharmacies typically filled one thousand orders per day. A pharmacist at one of Antonio's filling pharmacies testified that she was able to review only about 140 of the one thousand orders that were filled daily and that she was the only pharmacist on duty.[3]

Moreover, Antonio discussed with Dr. Jack Tomas, the owner of Innovative Remedies, a change in Florida law prohibiting Florida doctors from writing prescriptions without face-to-face consultations with their patients. Only days after the Florida law was passed, Antonio moved his filling pharmacy to Queens. In the next three years, Antonio moved his operations to more than ten different locations as law enforcement raided or shuttered his filling pharmacies. When law

_____

[3] Although the dissent makes much of Antonio's consultation with attorneys, there is no evidence that Antonio disclosed to any attorney any facts relevant to whether the doctors and pharmacists were acting outside the usual course of professional practice, including that the doctors and pharmacists were issuing prescriptions based only upon their review of a generic medical questionnaire and without any contact with patients.

enforcement shut down one of Antonio's pharmacies in Maryland, for example, an employee was directed to "shred paper" relating to its orders. Gov't App. 169. Two weeks later, Antonio abandoned the pharmacy for a new location after firing much of its staff. On another occasion, Antonio instructed Tomas to use an unlicensed location, the basement of a 99-cent store known as the "Cave," as a temporary pharmacy after a local inspector visited one of Antonio's pharmacies. At trial, Antonio testified that he instructed one of his pharmacists to lie to the authorities about how his operation was being conducted.

In 2003, the government subpoenaed Antonio for documents relating to the approximately 90,000 orders he had filled for Vincent Chhabra's website through Prescription & Travel. When Chhabra was arrested later that year for unlawful distribution of controlled substance medications, Antonio emailed Mahana a link to the news story. Following Chhabra's arrest, Antonio stopped using Prescriptions & Travel to fill orders for his websites and took steps to liquidate its assets. At trial, Antonio conceded that he used the same questionnaire and sold the same medications as Chhabra.

Between 2004 and 2006, government agents advised certain people working for Antonio that Internet pharmacies like the defendants' were illegal, and that information was relayed to Antonio. In December 2004, for example, Tomas informed Antonio that DEA agents had provided him a notice stating "that the online sale of prescription drugs was illegal." Gov't App. 103, 109-10. In January 2006, DEA agents informed Donald Cooper, one of Antonio's associates, that it was illegal to sell controlled substances through an Internet pharmacy. Cooper relayed that information to Antonio, who replied that "[i]f anybody would get into trouble, it would be the pharmacists and the doctors." *Id.* at 302.

Several months later, in May 2006, DEA agents visited Thundergames, which ran the call center for Antonio's websites, and advised two of Antonio's employees that Internet pharmacies were illegal because they lacked a legitimate doctor-patient relationship. One of those employees, Arianne Pelegrin, relayed this information to Antonio, who responded that "there was nothing to worry about." *Id.* at 197. Antonio, however, thereafter moved Thundergames' accounting department to an office at a car dealership. A short time later, Herman began running the customer service operation for his own pharmacy from the car dealership office space.

In these circumstances, we conclude that the government has adduced overwhelming evidence that the defendants knew or reasonably should have known that the doctors and pharmacists upon whom they purportedly relied were acting in bad faith. Any actual belief to the contrary would have been unreasonable. Thus, any error in giving a conscious avoidance instruction was not prejudicial to the defendants.

## II.     The Money Laundering Conviction

We turn next to Antonio's challenge of his money laundering conviction. The federal money laundering statute makes it a crime to conduct a "financial transaction" knowing that the property involved in the transaction represents the "proceeds" of some form of unlawful activity when the transaction in fact involves the proceeds of specified unlawful activity ("SUA"). 18 U.S.C. § 1956(a). Under the "promotional" prong of this statute, *id.* § 1956(a)(1)(A)(i), the government must prove that the defendant engaged in a financial transaction involving SUA proceeds with "the intent to promote the carrying on of specified unlawful activity." Under the "concealment" prong of the statute, *id.* § 1956(a)(1)(B)(i), the government must prove "that the

-12-

transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of [SUA]." The government asserts that it proved Antonio's culpability under both the "promotion" and "concealment" prongs. Antonio responds that the evidence underlying his conviction is insufficient under *United States v. Santos*, 553 U.S. 507 (2008), because the government proved only that the laundered funds were the gross revenues, rather than the profits, of an enterprise engaged in unlawful drug trafficking. We review his challenge *de novo*. *See, e.g.*, *United States v. Mazza-Alaluf*, 621 F.3d 205, 208-09 (2d Cir. 2010).

In *Santos*, the defendant, Efrian Santos, was convicted of running an illegal gambling business in violation of 18 U.S.C. § 1955 and of "promotional" money laundering and money laundering conspiracy in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (h). Santos ran an illegal lottery at bars and restaurants by employing "runners," who took bets from gamblers and kept a percentage of each bet as a commission, and "collectors," who received bets from the runners and relayed them to Santos. The money laundering "transaction" at issue was Santos's use of the bets to pay the runners and collectors as well as the winners of the lottery. 553 U.S. at 510.

In a fractured decision, the Supreme Court affirmed the Seventh Circuit's reversal of Santos's money laundering conviction. A four-Justice plurality (Justices Scalia, Souter, Thomas, and Ginsburg) concluded that the term "proceeds" in the money laundering statute means profits, not gross receipts. *Id.* at 510-14. It reasoned that, "[f]rom the face of the statute, there is no more reason to think that 'proceeds' means 'receipts' than there is to think that 'proceeds' means 'profits,'" and from there, applied the rule of lenity to conclude that "the tie must go to the defendant." *Id.* at 514. The plurality expressed concern that if the definition of "proceeds" were

-13-

not limited to profits, a money laundering charge would "merge" with the crime of running an illegal gambling business. *See id.* at 515 ("If 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery."). It noted that under this reading, prosecutors would "acquire the discretion" to charge the "greater money-laundering offense" instead of or in addition to the "lesser lottery offense" in nearly every case involving an illegal lottery. *Id.* at 516. For these reasons, the plurality concluded that "proceeds" must mean "profits," regardless of the SUA at issue.

Justice Stevens provided the fifth vote in favor of the Supreme Court's judgment affirming the Seventh Circuit's vacatur of Santos's conviction. In his opinion concurring in the judgment, Justice Stevens took the position that the definition of "proceeds" might depend upon the particular SUA underlying the money laundering charge at issue. *Id.* at 524-26 (Stevens, *J.*, concurring in the judgment). He emphasized the lack of legislative history indicating that Congress intended the term "proceeds" to mean "gross receipts" in the context of gambling offenses. *Id.* at 526. He also expressed concern about the "merger problem" identified by the plurality. *See id.* at 527 ("Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business."). He nevertheless concluded that legislative history evinces Congress's intent that the money laundering statute apply to transactions involving the gross revenues, not

-14-

just the profits, of certain other SUAs.  *Id.* at 528 n.7 ("In other applications of the statute not involving such a perverse result, I would presume that the [dissent] reflects the intent of the enacting Congress.").  For example, he reasoned, "Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales. . . . Thus, I cannot agree with the plurality that the rule of lenity must apply for these types of unlawful activities."  *Id.* at 525-26 & n.3.

In his dissent, Justice Alito, who was joined by Chief Justice Roberts and Justices Kennedy and Breyer, stated he would have held that the term "proceeds" means "gross receipts" in all circumstances.  *Id.* at 546 (Alito, *J.*, dissenting).  The dissent noted in particular that "five Justices agree with the position" that "the term 'proceeds' 'include[s] gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales.'"  *Id.* at 531 & n.1 (Alito, *J.*, dissenting) (alteration in original).

The scope of the Supreme Court's holding in *Santos* is a question of first impression in this Circuit.  Where, as in *Santos*, "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices," our task is to discern "that position taken by those Members who concurred in the judgment on the narrowest grounds."[1]  *See Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation mark omitted).

In reconciling the plurality opinion with Justice Stevens's concurrence, certain of our sister Circuits have limited *Santos* to its facts, holding that "proceeds" means "profits" only

---

[1] Congress subsequently amended the money laundering statute to define proceeds to include gross receipts.  18 U.S.C. § 1956(c)(9) (2009).  Our task therefore is to determine how the *Santos* Court would interpret "proceeds" with respect to money laundering charges based on offenses under the Controlled Substances Act committed prior to the money laundering statute's amendment in May 2009.

where the predicate SUA proceeds were derived from a gambling operation. *See, e.g.*, *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009) (concluding that *Santos*'s "narrow holding" applied only where the SUA is gambling and therefore did not apply to defendant who laundered funds received from illegal drug trafficking), *cert. denied*, 130 S. Ct. 421 (2009). Other Circuits have held that the government is not required to prove that the laundered funds were profits where the predicate offense is a drug offense. *See, e.g.*, *United States v. Webster*, 623 F.3d 901, 906 (9th Cir. 2010) ("We . . . read *Santos* as holding that where, as, here, a money laundering count is based on transfers among co-conspirators of money from the sale of drugs, 'proceeds' includes all 'receipts' from such sales."); *United States v. Spencer*, 592 F.3d 866, 879 (8th Cir. 2010) ("Other circuits hold — and this court agrees — that *Santos* does not apply in the drug context."). Others have indicated that *Santos* may apply more broadly. *See, e.g.*, *Garland v. Roy*, 615 F.3d 391, 401 (5th Cir. 2010) (construing "proceeds" as "profits" where the conviction raises a "merger problem" or legislative history "affirmatively supports interpreting 'proceeds' to mean 'profits'"); *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009) (holding that proceeds "means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such increase"), *cert. denied*, 130 S. Ct. 2115 (2010).

Antonio argues that his conviction must be reversed under *Santos* on the theory that it raises a "merger problem." Antonio is correct that the desire to avoid a "merger problem" united five Justices in holding that Santos's payments did not constitute money laundering. But he overlooks Justice Stevens's statement that "the legislative history of § 1956 makes it clear that

-16-

Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized criminal syndicates involving such sales" and Justice Stevens's disagreement with the plurality's position that "the rule of lenity must apply to the definition of 'proceeds' for these types of unlawful activities." *See Santos*, 553 U.S. at 525-26 & n.3 (Stevens, *J.*, concurring in the judgment). As the plurality acknowledged, Justice Stevens's concurrence determines the scope of the Court's holding. *Id.* at 523 ("Since his vote is necessary to our judgment, and since his opinion rests upon [a] narrower ground, the Court's holding is limited accordingly."). Justice Alito's dissent likewise recognized the agreement among five Justices that the term "proceeds" includes gross revenues from the sale of contraband. *Id.* at 532 n.1 (Alito, *J.*, dissenting). Accordingly, we hold that "proceeds" under 18 U.S.C. § 1956 is not limited to "profits" at least where, as here, the predicate offense involves the sale of contraband.[2]

Antonio rejoins that the controlled substances he distributed were not contraband because they were "sold . . . pursuant to prescriptions from physicians." Def.'s Reply Br. 32. This is incorrect. As Antonio concedes, controlled substance medications "become contraband if and when they are dispensed outside the usual course of professional practice." *Id.* The jury indeed found — and the record supports — that Antonio had unlawfully distributed Schedule III and IV controlled substances outside the course of professional practice and without a legitimate medical purpose. In any event, Antonio has not identified any case holding that the government must prove that the laundered funds were profits where the underlying offense involves unlawful

---

[2] Thus, we do not reach the question whether Antonio's conviction raises a "merger problem." Nor do we address the proper interpretation of "proceeds" under *Santos* where the predicate offense does not involve the sale of contraband.

distribution of a controlled substance. Antonio's argument therefore is unavailing.

Finally, Antonio does not dispute that the evidence of money laundering is sufficient under a definition of proceeds that includes "gross receipts," nor could he, given the ample record evidence of transfers of such funds with the intent to promote his illegal businesses.[3] Therefore, his argument that the evidence underlying his money laundering conspiracy conviction is insufficient under *Santos* is without merit.

## CONCLUSION

We have considered all of the defendants' arguments and find them to be without merit. We hold that any error in giving a conscious avoidance jury instruction was not prejudicial to the defendants because there was overwhelming evidence that they knew or should have known that the doctors and pharmacists upon whom they relied were acting in bad faith. We further hold that *United States v. Santos*, 553 U.S. 507 (2008), as applied to the sale of contraband, permits a conviction for money laundering conspiracy even absent proof that the laundered funds were profits. For the reasons stated herein and in the accompanying summary order, the judgments of the district court are **AFFIRMED**.

---

[3] We do not accept the government's position that "even if [it] had to prove profits were used in the money laundering transactions, it has met its burden." Gov't Br. 97. The district court "charge[d] this as a [gross receipts] case," Gov't App. 346, because, it concluded, there was no direct evidence that the money laundering transactions involved SUA profits. *See id.* at 345-46 ("I don't think that the government has really established a profits case . . . . [E]ven if there are profits in the case and the jury can reasonably conclude there were profits, I don't think the government has proven, from what I've been able to glean, where all those profits went . . . . I don't think that the government has sustained that burden of proof.").

STRAUB, *Circuit Judge*, dissenting in part, concurring in part:

With today's decision the majority blurs the once distinct and enforced parameters of our conscious avoidance jurisprudence. The Quinoneses raised two issues regarding the conscious avoidance jury instruction on appeal: (1) whether it should have been included in the jury charge at all and (2) whether its language violated our precedent, including, most recently, *United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010) because it did not account for their actual beliefs. While I agree that because the Quinoneses asserted "the lack of some specific aspect of knowledge required for conviction, and . . . the appropriate factual predicate for the charge exist[ed]," *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000), *cert. denied*, 532 U.S. 1037 (2001), the instruction was properly before the jury, I disagree with the majority's conclusion that the error found in the instruction's language was harmless. Because it is my opinion that the conscious avoidance instruction was fundamentally flawed and that the error was plain and prejudicial, I respectfully dissent and would vacate the judgment against the Quinoneses and grant them a new trial. Indeed, I suggest that *Kaiser* allows for no alternative. I concur in the majority opinion in all other respects.[1]

## I.      Doctrine of Conscious Avoidance

The doctrine of conscious avoidance stands for the principle "that a person who deliberately shuts his eyes to an obvious means of knowledge has sufficient *mens rea* for an

---

[1] By Summary Order, filed today, the majority affirms various other rulings made by the District Court. As I conclude that a new trial is necessary, I choose not to opine on those issues at this time.

1

offense based on such words as 'permitting,' 'allowing,' 'suffering' and 'knowingly.'"[2] *Edwards*, J. LL. J, *The Criminal Degrees of Knowledge*, 17 MOD. L. REV. 294, 298 (1954). In our Circuit, "a conscious avoidance charge must communicate two points: (1) that a jury may infer knowledge of the existence of a particular fact if the defendant is aware of a high probability of its existence, (2) unless the defendant actually believes that it does not exist." *Kaiser*, 609 F.3d at 565-66 (internal quotation omitted). While other circuits rarely have authorized the use of the instruction, *see, e.g.*, *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir.), *cert. denied*, 487 U.S. 1222 (1988), we have authorized it "somewhat more readily," *United States v. Rodriguez*, 983 F.2d 455, 457 (2d Cir. 1993).

Since adopting the conscious avoidance doctrine from English common law, American courts have balanced its application with a concern for defendants' actual beliefs. In *Spurr v. United States*, 174 U.S. 728 (1899), the Supreme Court first tacitly acknowledged the doctrine's legitimacy, but also recognized the improper usage of the conscious avoidance instruction deprived the defendant of his defense of honest belief. *Spurr*, 174 U.S. at 738-39. Later, this concern for defendants' actual beliefs was incorporated into the Model Penal Code's directive on conscious avoidance: "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." MODEL PENAL CODE § 2.02(7) (1962). The Supreme Court expressed its approval of this formulation in *Leary v. United States*, 395 U.S. 6, 46 n.93 (1969), and we require substantially similar language for a proper conscious avoidance

---

[2] In various American and English cases, the doctrine is also referred to as willful blindness, deliberate ignorance, connivance, and the deliberate closing of one's eyes. *See* Edwards, *The Criminal Degrees of Knowledge*, *supra*, at 302.

jury instruction in our Circuit. *See, e.g.*, *United States v. Feroz*, 848 F.2d 359, 360 (1988) (per curiam). District courts and prosecutors have been on notice for over three decades that the "actual belief" language must be "incorporated into every conscious avoidance charge." *Feroz*, 848 F.2d at 361; *see also United States v. Sicignano*, 78 F.3d 69, 71 (2d Cir. 1996) (per curiam).

The "actual belief" prong is critical to ensure a proper conscious avoidance jury instruction. The risk of the language's exclusion is dire because "[f]ailure to include that proviso improperly permits the jury to convict a defendant who honestly believed that he was not engaging in illegal activity." *Sicignano*, 78 F.3d at 72. Moreover, as the proviso goes to what a defendant believes, and not what he knows or should know, the belief held by the defendant need not be reasonable in order for it to defeat a conscious avoidance theory of actual knowledge. *See United States v. Catano-Alzate*, 62 F.3d 41, 43 (2d Cir. 1995) (per curiam) ("[T]he doctrine of conscious avoidance does not permit a finding of guilty knowledge if the defendant actually did not believe that he or she was involved in the transportation of drugs, however irrational that belief may have been."). In cases like this one, where a defendant relies on his lack of knowledge of a crucial fact as a central element of his defense, the "actual belief" language is "particularly appropriate." *United States v. Morales*, 577 F.2d 769, 773-74 (2d Cir. 1978) (citing *United States v. Bright*, 517 F.2d 584 (2d Cir. 1975)).

**II.     The Error in the Conscious Avoidance Jury Instruction Was Not Harmless**

3

**A.      Standard of Review**

Because the Quinoneses did not specifically object to the language of the conscious avoidance jury instruction, we review for plain error. FED. R. CRIM. P. 30(d). Under this standard, the Quinoneses must demonstrate that any error "(1) is clear or obvious, rather than subject to reasonable dispute; (2) affected [their] substantial rights—i.e., that there is a reasonable probability that the error affected the outcome of the trial; and (3) seriously affects the fairness, integrity or public reputation of judicial proceedings." *Kaiser*, 609 F.3d at 565 (quoting *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (internal quotation marks and alterations omitted)).

**B.      The Conscious Avoidance Charge was Fundamentally Flawed**

The conscious avoidance instruction in this case, much like the one we found deficient in *Kaiser*, "contained nothing to suggest that actual belief would absolve [the Quinoneses] of culpability." *Kaiser*, 609 F.3d at 566. The District Court charged the jury:

> In determining what the defendant knew or reasonably should have known, you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious. This does not mean that the defendant acted carelessly, negligently or even foolishly. One may not, however, avoid criminal liability by wilfully and intentionally remaining ignorant of a fact material and important to his or her conduct. Thus, even if you find beyond a reasonable doubt that the defendant was aware that there was a high probability that the doctors and pharmacists were acting outside the usual course of professional practice and not for a legitimate medical purpose, but deliberately and consciously avoided learning this fact, then you may treat this deliberate avoidance of knowledge as the equivalent of knowledge.

This instruction is completely silent on the Quinoneses' actual beliefs, and thus it is wholly deficient and clearly erroneous.

4

The majority contends that the instruction above is distinguishable from the one found in *Kaiser* because here it was presented as an alternative means of proving "what defendant[]s knew or *reasonably should have known*," Maj. Op. at 9, as opposed to only what the defendant knew, as was the case in *Kaiser*. This argument renders irrelevant the conscious avoidance instruction in this case. The instruction was presented as an alternative means for the jury to find the knowledge element of the charged offenses, and therefore may well have been the basis by which the jury found the Quinoneses guilty, particularly in its flawed state. The majority is wrong that "the defendants' actual but unreasonable belief in the existence of a fact—here, the doctors' and pharmacists' good faith—could not absolve the defendants of culpability." *Id.* Our conscious avoidance cases say the opposite: If the jury found that the Quinoneses actually believed that the doctors and pharmacists were acting in good faith, it could not have convicted them under the doctrine of conscious avoidance. *Kaiser*, 609 F.3d at 566; *Sicignano*, 78 F.3d at 72. Because the jury was not presented with the "actual belief" proviso, however, it had almost no alternative but to find the Quinoneses guilty when it combined the flawed conscious avoidance instruction with the *should have known* knowledge element.

Because the conscious avoidance instruction "was presented as an alternative basis on which the jury could find knowledge[,] . . . . it is possible that the jury could have convicted [the Quinoneses] even if it concluded [they] had an actual belief" that the doctors and pharmacists were acting in good faith. *Kaiser*, 609 F.3d at 566. Indeed, I am convinced that there is "a reasonable probability that the jury convicted [the Quinoneses] on a conscious avoidance theory and that the jury would not have done so but for the instructional error." *Id*. at 567. Thus, the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings,"

5

*Marcus*, 130 S. Ct. at 2164, and by the same rationale we offered in *Kaiser*, the Quinoneses should be entitled to a new trial.

### C.      Overwhelming Evidence of Knowledge and the Quinoneses' Actual Beliefs

Putting aside its attempt to distinguish *Kaiser*, the majority opinion holds that even if the instruction was improperly worded, the error was non-prejudicial and, thus, harmless because (1) the government presented overwhelming evidence that the Quinoneses actually knew or should have known that the doctors and pharmacists were acting in bad faith and (2) the Quinoneses' actual beliefs were unreasonable and consequently would not absolve their crimes. I find the majority's first rationale unpersuasive and I believe the second misapplies the law.

The majority's opinion rests on its finding that there was overwhelming evidence of "actual knowledge." *See Kaiser*, 609 F.3d at 566-67. Upon completing the harmless error inquiry, which extends to "the record as a whole," *United States v. Onumonu*, 967 F.2d 782, 789 (2d Cir. 1992), and without drawing inferences in the government's favor, *see generally United States v. Mejia*, 545 F.3d 179, 199 n.5 (2d Cir. 2008), I come to the opposite conclusion. The evidence tends to indicate that the Quinoneses honestly believed their business was legal; it is certainly not "essentially uncontroverted" that they knew the practitioners were acting in bad faith. *Kaiser*, 609 F.3d at 567 (citing *United States v. Cotton*, 535 U.S. 625, 633 (2002)). Moreover, when considering whether there was overwhelming evidence that they *should* have known, we must account for the jury instruction that the Quinoneses were "entitled to reasonably rely on the determinations of doctors and pharmacists."

6

The Quinoneses' defense, like that of the defendants in *Kaiser*, 609 F.3d at 561, and *Sicignano*, 78 F.3d at 71, was predicated on their lack of knowledge of a key fact—in this case, that the doctors and pharmacists involved in their internet pharmacy operation were acting outside the usual course of professional practice. The jury heard ample testimony from Antonio on the steps he took to ensure that his business was legal and on his actual belief that the doctors and pharmacists were operating in good faith. He consulted with an attorney, who visited the pharmacy, reviewed the business in operation, checked the prescriptions, and concluded that the business was legal. He also spoke with at least one doctor in Puerto Rico to ensure that the doctors were licensed and the internet pharmacies in compliance with the law. He paid an additional attorney to research and explain a telemedicine law enacted in Puerto Rico that he believed allowed him to operate his internet pharmacies legally. Furthermore, as the majority discussed, Antonio moved his business out of Florida when a new law was enacted prohibiting Florida doctors from writing prescriptions without face-to-face consultations. He also maintained a "block list" to prevent drug abusing customers from repeatedly purchasing pills. This evidence, along with Antonio's uncontroverted testimony that he honestly believed that his business was in compliance with the law would allow a rational juror to conclude (1) that the Quinoneses actually believed that the doctors and pharmacists were operating in good faith and (2) that they did not have actual knowledge to the contrary.

Considering the facts before us, including the evidence tallied in the majority opinion, I do not believe that the evidence of "actual knowledge" in the Quinoneses' case was "overwhelming" when compared to the evidence of "actual belief," nor indeed any stronger than the evidence presented in *Kaiser*. In *Kaiser*, the government put forth evidence that the

7

defendant manipulated payments to his employer in order to convince auditors that vendors were paying down their outstanding account balances. *Kaiser*, 609 F.3d at 562. Government witnesses testified that the defendant developed a scheme to show inflated profits and income for his employer and lied to auditors. *Id*. at 562-63. The government introduced direct evidence of the alleged scheme, including a co-conspirator's notes from conversations with the defendant as well as letters allegedly signed by him. *Id*. at 567, 574. We determined that this evidence was not "overwhelming" in the face of the defendant's testimony that he was taking orders from others and that he believed his actions were legal. *Id*. at 566-67. We also credited the defendant's argument that because most of the inculpatory testimony came from cooperating witnesses, it may have been unreliable. *Id*. In the Quinoneses' case, likewise, the jury heard from Antonio himself as to his reliance upon the doctors and pharmacists, and many of the other witnesses testifying were government cooperators.

The majority claims that this case is different from *Kaiser*, insofar as the Quinoneses would still have been convicted if they reasonably *should have* known that the doctors and pharmacists were acting in bad faith. The majority contends that there was overwhelming evidence that they should have known this fact. This reasoning ignores the good-faith reliance instruction included in the jury charge. The District Court's statement on "good faith" immediately preceded the conscious avoidance instruction:

> The defendant is entitled to reasonably rely on the determinations of doctors and pharmacists. This means that even if you find that the doctors and pharmacists who allegedly wrote and filled the prescriptions at issue in this case were not, in fact, acting in good faith, as I previously defined the phrase of good faith to you, you must find the defendant not guilty unless the government proves beyond a reasonable doubt that the defendant knew or reasonably should have known that the doctors and pharmacists were not acting in good faith and if you find that to be the case, then the defendants will be guilty.

8

Accounting for this instruction, the government needed to prove that after speaking with doctors, who assured him that the drugs were being prescribed in good faith, Antonio nonetheless should have known that these doctors were not telling the truth.

Just as with "actual knowledge," I do not think that the evidence before our Court allows for a finding that there was overwhelming evidence that the Quinoneses should have known the practitioners were acting in bad faith. As the record contains conflicting testimony as to what the Quinoneses knew and believed, as well as clear evidence that Antonio consulted with both the doctors as well as attorneys about whether his business was legal, a jury should determine whether the Quinoneses are guilty after hearing a proper jury charge. *See generally United States v. Payne*, 591 F.3d 46, 60 (2d Cir.), *cert. denied*, 131 S. Ct. 74 (2010) ("Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." (internal alterations and quotation marks omitted)). Again, as the conscious avoidance jury instruction was employed as an alternative means of proving the Quinoneses' knowledge, it is possible that the juxtaposition of the good faith and conscious avoidance instructions left the jury confused as to the proper standard. The jurors may have thought they had little choice but to convict the Quinoneses considering the interplay between the reasonably should have known standard and the flawed conscious avoidance language. It is unclear from the record whether the jury convicted the Quinoneses under an actual knowledge or a conscious avoidance theory. "[N]o matter how often the jury was instructed that it could not convict unless it found that the defendant acted knowingly, this was undermined by the charge that the jury could find '[the Quinoneses] acted knowingly if you find that [they] deliberately . . .

9

closed [their] eyes to what otherwise would have been obvious to [them],' without the necessary [actual belief] proviso." *Sicignano*, 78 F.3d at 72 (internal alterations omitted).

Whether the Quinoneses' beliefs were reasonable does not change our analysis. *See United States v. Catano-Alzate*, 62 F.3d 41, 43 (2d Cir. 1995) (per curiam). If the jury intended to convict the Quinoneses under the conscious avoidance doctrine, but found that they actually believed that the doctors and pharmacists were operating in good faith, then it would have been required, using the correct standard, to acquit, regardless of whether it found the Quinoneses' beliefs were reasonable. While it is true that the jury would still be free to convict the Quinoneses under the "reasonably should have known" standard found in the jury instructions, I think there is "a reasonable probability that the jury convicted [the Quinoneses] on a conscious avoidance theory and that the jury would not have done so but for the instructional error." *Kaiser*, 609 F.3d at 567. Thus, the jury instructions were fundamentally flawed and the error was not harmless.

**CONCLUSION**

In sum, I fear that today's opinion seriously undermines the distinct and enforced parameters of our previous conscious avoidance jurisprudence and will leave prosecutors to conclude that the precision heretofore expected is no longer necessary. The jury instructions in this case were fundamentally flawed because they lacked the "actual belief" proviso that we require in all conscious avoidance instructions presented to a jury. As a result, I respectfully dissent and conclude that the language of the conscious avoidance jury instruction was plain

10

error.  I would vacate Antonio and Herman Quinones's convictions and remand the case for further proceedings as appropriate, including a new trial.