17-331
*United States v. Kalaba*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

**At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at 40 Foley Square, in the City of New York, on the 14ᵗʰ day of March, two thousand eighteen.**

PRESENT:
        ROBERT A. KATZMANN,
                *Chief Judge*,
        DENNY CHIN,
                *Circuit Judge*,
        ALISON J. NATHAN,[*]
                *District Judge*.

_____

UNITED STATES OF AMERICA,

                *Appellee*,

        v.                                                     No. 17-331

PAUL WISEBERG, GERALD WISEBERG, STEPHANIE
TOMASINI, LANA WISEBERG, EMMANUEL ANTONIO,
DANIEL PODELL, HOWARD HISRCH, LAWRENCE
ZASLOW,

                *Defendants*,

ROBERT KALABA,

                *Defendant-Appellant*.

[*] Judge Alison J. Nathan, of the United States District Court for the Southern District of New York, sitting by designation.

1

For Defendant-Appellant:               Jane Fisher-Byrialsen and Kaitlin F. Nares,
                                       Fisher & Byrialsen, PLLC, New York, NY.

For Appellee:                          Shawn G. Crowley, Edward B. Diskant,
                                       Daniel B. Tehrani, and Shane T. Stansbury,
                                       Assistant United States Attorneys, *for*
                                       Geoffrey Berman, United States Attorney for
                                       the Southern District of New York, New
                                       York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Torres, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant Robert Kalaba appeals from a judgment of the Southern District of New York (Torres, *J.*), entered January 24, 2017, convicting Kalaba, following a jury trial, of four counts related to the illegal distribution of prescription narcotics and sentencing him to principally 84-months' imprisonment. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

On October 22, 2015, a jury convicted Kalaba and co-defendant Paul Wiseberg of conspiracy to distribute or illegally dispense—or possess with intent to do so—a controlled substance, in violation of 21 U.S.C. §§ 841(b), 846 (the "Narcotics Count"); conspiracy to use an invalid Drug Enforcement Administration ("DEA") number, in violation of 21 U.S.C. §§ 843(a), 846; and conspiracy to commit money laundering, in violation of 21 U.S.C. § 1956(h) (the "Money Laundering Count").[1] Kalaba and Wiseberg (collectively "defendants") were the

---

[1] Kalaba was also charged with conspiracy to distribute, and possess with intent to distribute, promethazine with codeine, in violation of 21 U.S.C. §§ 841(a), 846. He pleaded guilty to this charge and it is not at issue here.

manager and owner, respectively, of the Plainfield Pharmacy ("Plainfield") and two other pharmacies, one in Manhattan and one in Union City, New Jersey. The government presented evidence that the defendants' pharmacies primarily distributed mail-order prescription narcotics to patients from pain clinics in Florida while ignoring indicia that the patients lacked a legitimate medical need for the drugs and concealed the proceeds of their business using a series of shell corporations. Kalaba moved for a post-verdict judgment of acquittal as to the Narcotics Count and the Money Laundering Count, pursuant to Federal Rule of Criminal Procedure 29(c) or, in the alternative, for a new trial pursuant to Rule 33. The motions were denied. On appeal, Kalaba argues that the district court erred in denying the motions because there was insufficient evidence to convict him of either the Narcotics Count or the Money Laundering Count.

"A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). The court reviews such a challenge *de novo*, *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004), but the evidence is viewed in the light most favorable to the government and a jury verdict will be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). A court applies the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008). In addition, "'the jury's verdict may be based entirely on circumstantial evidence,'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)), and the government is not obligated to "disprove every possible hypothesis of innocence," *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998) (internal quotation marks omitted), because "the task of

3

choosing among competing, permissible inferences is for the [jury], not the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

## I.      Narcotics Count

With respect to the Narcotics Count, Kalaba raises two arguments: first, that the government failed to show that he distributed prescription painkillers unlawfully because the law contains a "good faith" exception for medical practitioners and the pharmacies that work with them; and second, that there is insufficient evidence that he knew about the conspiracy and agreed to join. As Kalaba's argument suggests, the Narcotics Count has two elements: (1) the conspiracy charged in the indictment—to distribute or illegally dispense a controlled substance—existed, and (2) each defendant knowingly and intentionally joined the conspiracy. *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014). Pursuant to the good faith exception, for the government to have established unlawful distribution of a controlled substance "the jury must have found that [Kalaba] knew or reasonably should have known that the doctors and pharmacists were distributing controlled substances outside the usual course of professional practice and without a legitimate medical purpose—or, in other words, that these professionals acted in bad faith." *United States v. Quinones*, 635 F.3d 590, 595 (2d Cir. 2011) (internal quotation marks omitted); *see also id.* at 594 ("A lay defendant likewise may be convicted of unlawful distribution of a controlled substance where the defendant relies upon a doctor's prescription that he knows or reasonably should have known was invalid.").

The evidence presented at trial easily satisfied these elements. When Wiseberg purchased Plainfield in 2011, it was distributing fewer than 5,000 oxycodone dosage units a month; by 2013 that number had increased to 40,000 dosage units. At times, up to 81 percent of Plainfield's customers were receiving narcotics and 95 percent of those customers received their prescription

via mail. According to the government, this was no accident. Wiseberg previously owned a Florida pharmacy that was shut down by the DEA and had relationships with pain clinics in Florida. At trial, Joel Shumack, the owner of one of those clinics testified that his clinic was a "pill mill"— most of his customers did not need the medication they were prescribed and, as a result, local CVS and Walgreen pharmacies refused to fill prescriptions issued by his clinic. App. at 553, 560. When Wiseberg opened Plainfield, Shumack's clients began filling their prescriptions there. Kalaba was aware of this arrangement because Shumack called Kalaba to complain when his clients' prescriptions were not being filled expeditiously.

Wiretap communications provided further evidence that Kalaba was aware of and participated in the scheme to distribute narcotics to customers with no legitimate medical need. In one recorded call, Kalaba remarked to a friend that Plainfield was filling prescriptions for six people at the same address: "Hoffman has one fucking crew! They're all going to the same address! Six of em!" Add. 6. When the caller observed "that's bad bro . . . " and advised Kalaba not to fill the orders, Kalaba said Wiseberg did not want to send the customers their money back and instructed Kalaba to fill the prescriptions. *Id.* Kalaba summarized Wiseberg's motives: "Greedy, greed, greed, greed, greed, greed." *Id.* at 7. The government also presented video footage, recorded by a cooperator, showing Kalaba and Wiseberg filling prescriptions in the pharmacy on a day when it was closed. A new pharmacist at Plainfield had become concerned about the pharmacy's practices and refused to fill the narcotics prescriptions. Kalaba and Wiseberg, neither of whom were certified pharmacists, responded by surreptitiously filling 20 narcotics prescriptions without consulting a pharmacist or a prescribing physician. The government argues that this alone is sufficient to show that Kalaba was acting in bad faith.

But there is more: Plainfield's written procedures instructed customers, "Do not call or visit the pharmacy or you will not be filled," and advised "Obtain a money order (no checks, credit cards, debit cards, cash, Medicaid or any other insurance)." Add. 2. The government's pharmaceutical expert testified that these policies raised significant red flags because many states require pharmacists to provide drug counseling to patients—which they cannot do if patients cannot contact them—and pharmacies ordinarily have a very high percentage of insurance payments. The defendants also tried to conceal Plainfield's activities by using a fake return address on mail-order prescriptions, failing to disclose any income from Plainfield on their tax returns, and lying to a DEA agent who paid a visit to Plainfield in September 2012. Kalaba told the agent that the pharmacy's customers were mostly diabetes, blood pressure, and HIV patients and that 85 percent of his billings came from insurance.

In response, Kalaba points to evidence that Plainfield employees called to verify prescriptions with doctor's offices, and kept extensive records, including fulfillment agreements with clients from pain clinics, incident reports regarding customers who failed to comply with Plainfield's policies, and letters of necessity for each controlled substance prescription. However, the government introduced evidence that pain clinics illegally distributing prescription narcotics commonly "papered their files" to create the appearance of legitimacy, and the pharmaceutical expert testified that verifying a prescription does not relieve a pharmacist of his or her responsibility to ensure that the prescription serves a legitimate medical purpose. Similarly, Kalaba's emphasis on testimony that Santa Marina Pharmacy (also owned by defendants) used practices on par with Duane Reade does not negate the evidence of abuse at Plainfield. Moreover, to the extent that the testimony cited by Kalaba contradicts evidence presented by the

6

government, the task of choosing among competing evidence falls to the jury, not this Court. *McDermott*, 245 F.3d at 137.

In sum, viewed in the light most favorable to the government, the evidence shows that Kalaba knew that Plainfield's business model was predicated on filling mail-order prescriptions for "pill mills," filled prescriptions against the objections of a licensed pharmacist, and did so in the face of ample indicia that customers lacked legitimate medical need. Accordingly, we find that there is sufficient evidence to sustain Kalaba's conviction on the Narcotics Count.

## II.    Money Laundering

Turning to the Money Laundering Count, Kalaba argues that the government failed to establish both that a conspiracy to launder money existed and that he agreed to join said conspiracy. The two elements of a money laundering conspiracy are the existence of a conspiracy and that the defendant knowingly participated in it. *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009). Here, the two objects of the conspiracy charged by the government were "engaging in financial transactions that involved the proceeds of illegal narcotics transactions" with the intent either (a) "to *promote* the carrying on of narcotics transactions" or (b) "to *conceal* the nature, location, source, ownership, and control of the proceeds." App. at 1558 (emphases added). The evidence is sufficient to sustain Kalaba's conviction with regard to both objects.

According to testimony from an Internal Revenue Services' criminal investigator who reviewed Plainfield's bank accounts, from November 2011 to October 2013 $2 million dollars were deposited into Plainfield's accounts. Kalaba and Wiseberg were both signatories on these accounts. During that period, Plainfield spent approximately $655,000 in purchasing pharmaceuticals from distributors, and several of these payments were traced directly to purchases of controlled substances. Plainfield also made payments directly to Sun Park

7

Pharmacy ("Sun Park"), a corporation registered in the name of Dila Kalaba, the defendant's mother. Sun Park, in turn, made payments to Kalaba. Plainfield also transferred approximately $350,000 to various entities controlled by Wiseberg, including two different shell companies—Direct Management Services, Inc. and Metrosource, Inc. There was no evidence that any of these corporate entities provided any goods or services to Plainfield.

The use of Plainfield proceeds to purchase prescription narcotics is sufficient to demonstrate promotional laundering which involves the "receipt and deposit of laundered funds . . . made with the intent to promote the specified underlying unlawful activity." *United States v. Thom*, 317 F.3d 107, 133 (2d Cir. 2003). Here, narcotics distribution was the unlawful activity and the proceeds were used to purchase additional narcotics in furtherance of the illegal scheme. *Id.* at 133–34.

The evidence also demonstrates a conspiracy to conceal: as explained above, there is evidence that the money Plainfield made payable to Sun Park represented the proceeds of an illegal narcotics distribution conspiracy and that Kalaba knew this. In addition, because the evidence indicated that Sun Park is a shell company that did nothing to warrant the receipt of payments from Plainfield, a jury could conclude that the payments from Plainfield to Sun Park, which were then transferred to Kalaba, were "designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of those proceeds." *United States v. Henry*, 325 F.3d 93, 103 (2d Cir. 2003).

We have considered all of Kalaba's arguments and have found in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk

8